FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ SEP 07 2012 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
JAMES WHITING,

                Petitioner,

    -against-

DARWIN LA CLAIR,

                Respondent.
-------------------------------------------------------------------x

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
09-CV-1903 (CBA)

AMON, Chief United States District Judge:

    James Whiting, pro se, has filed a petition for a writ of habeas corpus pursuant to 28

U.S.C. § 2254, challenging his conviction for Robbery in the First Degree, N.Y. Penal Law

§ 160.15(4). Whiting claims that he received ineffective assistance of counsel at trial and that

the prosecution withheld <u>Brady</u> material. For the reasons that follow, Whiting's petition is

denied.

**BACKGROUND**

**I.    Trial and conviction**

    At Whiting's trial, the state presented evidence that at approximately 1:00pm on February

4, 2003, Alex Negron was robbed at gunpoint by two men inside a restaurant in Brooklyn, New

York. Negron testified that at the time of the robbery he did not know the two men, but had seen

them around the neighborhood. (Trial Tr. at 30.) After the robbery, Negron went to his house to

call the police. (<u>Id.</u> at 38.) Shortly thereafter, Negron accompanied some officers on a canvas of

the neighborhood but they were unable to locate the robbers. (<u>Id.</u>)

    Negron went to the police station where he described the robbers to Detective Erik Parks.

He described the shorter of the two robbers (later identified as Whiting) as approximately 5'5" to

5'8", 150 pounds, in his late twenties, and wearing a beige jacket at the time of the robbery. (<u>Id.</u>

1

at 38-39.) He described the taller robber (later identified as Whiting's co-defendant Joseph Grajales) as approximately 6'2", 180 pounds, and wearing a navy blue jacket and carrying a silver handgun at the time of the robbery. (Id.)

While Negron was at the precinct giving his statement, Detective Parks learned that his supervisor, Sergeant Brill, had received an anonymous tip that three men known as Corky, Mousey, and Unique were responsible for the robbery. (Id. at 133.) Detective Parks knew that Corky was a nickname used by Grajales. (Id. at 134.) Detective Parks also learned that Mousey was a nickname used by an individual with the last name Mazcyck. (Id. at 135.) Detective Parks showed two photo arrays to Negron, one that included a photo of Grajales and one that included a photo of Mazcyck. Neither array contained a photo of Whiting. Negron identified Grajales as one of the robbers in the first photo array, but did not identify Mazcyck in the second array. (Id. at 134-35.)

One week later, on February 11, 2003, at about 7:40 p.m., Negron and a friend were in a taxi approximately one block from the site of the robbery. (Id. at 40.) Negron's friend, to whom Negron had previously described the men who robbed him, told Negron that he saw a man who looked like one of the robbers. (Id.) Negron looked out of the window of the car and saw a man that he recognized as the shorter of the two robbers. (Id. at 41-43.) Negron also recognized the man's beige jacket as matching the jacket that the shorter robber had been wearing during the robbery. (Id. at 43.) This man was later identified as Whiting. Whiting was soon joined by a man Negron recognized as the taller robber, later identified as Grajales (as well as by the nickname Corky). (Id.) Negron called the police and Whiting and Grajales were arrested. (Id. at 45.) A subsequent precinct search of Grajales turned up a loaded, operable pistol that Negron identified at trial as the firearm used in the robbery. (Id. at 46.)

2

Whiting moved to sever his trial from the trial of Grajales on the grounds that Whiting intended to introduce evidence at trial that the anonymous tip led to the identification of Grajales by nickname, but that Whiting was not known by any of the nicknames given by the informant. The trial court granted the severance motion. On May 19, 2004, Whiting was convicted of Robbery in the First Degree, N.Y. Penal Law § 160.15(4). On June 16, 2004, the court sentenced Whiting to eleven years' imprisonment. Grajales was tried separately and also convicted of first-degree robbery.

## II.     Direct appeal and state collateral review

Whiting appealed his conviction and sentence to the New York Supreme Court, Appellate Division, Second Department ("Appellate Division"), asserting several grounds for relief, including a claim that the prosecution withheld Brady material. The Appellate Division affirmed Whiting's sentence and conviction on December 12, 2006. People v. Whiting, 824 N.Y.S.2d 905 (N.Y. App. Div. 2006). As to Whiting's Brady claims, the Appellate Division stated that "defendant's contentions in point two of [] his brief relating to Brady violations . . . are without merit." Id. at 905. The New York Court of Appeals denied Whiting's application for leave to appeal on March 12, 2007. People v. Whiting, 8 N.Y.3d 928 (2007).

On February 15, 2008, Whiting filed a motion to vacate the judgment of conviction pursuant to N.Y. Criminal Procedure Law § 440.10. Whiting alleged that he was denied effective assistance of counsel at trial because his attorney failed to investigate and call an alibi witness. Whiting also alleged various deficiencies in the way his trial counsel handled and presented the evidence available at trial. Following a three-day evidentiary hearing on the merits of Whiting's ineffective assistance claim, the Supreme Court, Kings County, denied Whiting's motion. People v. Whiting, 21 Misc. 3d 1131A, 2008 WL 4916298 (N.Y. Sup. Ct. 2008). The

3

Appellate Division denied Whiting's motion for permission to appeal. People v. Whiting, ___ A.D.3d ___, App. Div. No. 2009-00012 ( N.Y. App. Div. 2009).

### III. Federal habeas petition

Whiting filed his federal habeas petition in this Court on April 30, 2009. (DE#1.) His original habeas petition asserted two primary grounds for relief: (1) that he was denied the effective assistance of counsel at trial; and (2) the prosecution violated Brady by failing to turn over (a) a tape of the 911 call made on the date of the robbery; (b) Sergeant Brill's memo-book notes describing the anonymous tip received; and (c) a pedigree sheet containing details about Mousey's nickname, weight, and height. This Court ordered the prosecution to show cause why the petition should not be granted. (DE#2.) The prosecution submitted its response to the order to show cause on August 19, 2009, arguing among other things that Whiting's Brady claim based on the prosecution's failure to turn over the alleged 911 tape was unexhausted because this claim was presented to the state court based on state law grounds only, not as a Brady claim. (DE#10.) The prosecution argued that the Court should dismiss the habeas petition as a "mixed petition" containing an unexhausted claim.

Whiting subsequently filed an amended habeas petition dated August 21, 2009, omitting the unexhausted Brady claim regarding the 911 tape. (DE#12.) The remaining claims asserted in the amended petition are substantially the same as those asserted in the original habeas petition. The prosecution indicated by letter dated September 11, 2009, that it opposed Whiting's application to file an amended petition. (DE#16.) The prosecution also indicated in that letter that it would rely on the arguments contained in its August 19, 2009, opposition to the original habeas petition if the Court accepted the amended petition. The Court accepted the

4

amended petition, which is the petition now before this Court. (DE#15.) Whiting filed a reply to

the prosecution's opposition dated October 16, 2009. (DE#17.)

## STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a federal

habeas petitioner is entitled to relief from a state court's "adjudication on the merits" of a claim

only if it resulted from a decision that "was contrary to, or involved an unreasonable application

of, clearly established federal law, as determined by the Supreme Court of the United States; or .

. . [was] based on an unreasonable determination of the facts in light of the evidence presented in

the State court proceedings." 28 U.S.C. § 2254(d)(1)–(2); see also Williams v. Taylor, 529 U.S.

362, 405–06 (2000); Henry v. Poole, 409 F.3d 48, 67 (2d Cir. 2005). The Supreme Court has

explained the requirements of § 2254(d) as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the
> state court arrives at a conclusion opposite to that reached by this Court on a
> question of law or if the state court decides a case differently than this Court has
> on a set of materially indistinguishable facts. Under the "unreasonable
> application" clause, a federal habeas court may grant the writ if the state court
> identifies the correct governing legal principle from this Court's decisions but
> unreasonably applies that principle to the facts of the prisoner's case.

Williams, 529 U.S. at 412-413.

## DISCUSSION

### I.      Ineffective Assistance of Counsel

Whiting argues that the state court erred in denying his § 440.10 motion to vacate the

judgment of conviction on the grounds that he receive ineffective assistance of counsel at trial.

Because Whiting's ineffective assistance of counsel claims were adjudicated on the merits by the

state court, AEDPA deference applies to those determinations. Thus, this Court must determine

whether the state court's rulings were contrary to, or an unreasonable application of, clearly established federal law.

"To prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate that: (1) counsel's representation fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." U.S. v. Pitcher, 559 F.3d 120, 123 (2d Cir. 2009) (citing Strickland v. Washington, 466 U.S. 668, 694 (1984)). "'The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error.'" Id. (quoting Kimmelman v. Morrison, 477 U.S. 365, 381 (1986)). In analyzing counsel's alleged deficiency, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689. Because "[t]here are countless ways to provide effective assistance in any given case," Strickland, 466 U.S. at 689, the lack of success of a chosen strategy should not cause a court to second-guess an attorney's judgments. Cuevas v. Henderson, 801 F.2d 586, 590 (2d Cir. 1986).

Whiting claims that he told his trial counsel that at the time of the robbery he was shopping at a shoe store with his then-girlfriend Cheryl Foster. He argues that the state court erred in determining that his trial counsel was not ineffective as a result of her failure to (1) adequately investigate the shoe store alibi before trial; and (2) call Foster as an alibi witness at trial. The state court held a three-day evidentiary hearing to address these claims on collateral review. A detailed recitation of the evidence presented at the hearing can be found in the state court's opinion denying Whiting's § 440.10 motion. People v. Whiting, 2008 WL 4916298, at *1-10.

6

Whiting's trial counsel, Wadeedah Sheeheed, testified at the evidentiary hearing. She explained that she first spoke with Whiting about the robbery on February 27, 2003. (Hearing Tr. 41.) Whiting told her that the morning of the robbery he was with Foster at a Chase ATM. (Id. at 20.) In this first meeting, Whiting did not say anything to Sheeheed about accompanying Foster to a shoe store after they left the ATM, and neither did Foster when Sheeheed first spoke with her. (Id. at 37.) Instead, Sheeheed testified that Whiting told her that he parted ways with Foster after they went to the ATM. (Id.) Sheeheed obtained Foster's ATM receipt which showed the time of the ATM transaction as 12:46pm. (Id. at 45-46.) She also obtained photographs from the bank surveillance camera. (Id. at 27.) The photographs showed Foster making an ATM transaction, accompanied by Whiting who was wearing a beige jacket. (Id.)

Sheeheed believed that the ATM photographs would be harmful to Whiting's case. (Id. at 29, 46.) She explained at the evidentiary hearing that the ATM was only one block from the site of the robbery, the photographs were taken approximately 20-40 minutes before the robbery, and the coat worn by Whiting in the photograph matched the description of the beige coat worn by one of the robbers. (Id. at 46.) Because Sheeheed did not find the photographs helpful, she did not inform the prosecution of their existence. (Id. at 52-53.) Sheeheed recalled that she met with Whiting on March 17, 2003—shortly after she received the ATM photographs—and that Whiting once again failed to mention the shoe store alibi. (Id. at 274.)

According to Sheeheed, the first time Whiting ever told her that he left the ATM with Foster and accompanied her on the bus to a nearby shoe store was sometime after May 6, 2003, over two months after Sheeheed's first interview with Whiting. On May 20, 2003, Foster provided a receipt for boots purchased at the shoe store at 1:20pm on February 4, 2003. (Id. at 48.) Sheeheed admitted at the evidentiary hearing that she did not immediately send an

7

investigator to the shoe store or make any additional effort to find witnesses who could corroborate this alibi, because she did not believe this new story she was being told for the first time months after her initial meetings with Whiting and Foster. (Id. at 48, 56.) Sheeheed testified that if they had told her about the shoe store alibi from the beginning, she would have investigated the shoe store alibi at that time. (Id. at 57.) Instead, Sheeheed decided to use a polygraph to see if Whiting was telling the truth about the shoe store, but Whiting did not take the polygraph. (Id. at 79-80.)

Sheeheed interviewed Foster about the shoe store alibi, but Foster was reluctant to cooperate, claiming that both her new boyfriend and her employer (the Department of Homeland Security) were unhappy with her involvement in the case. (Id. at 205.) After meeting with Foster, Sheeheed determined that Foster's demeanor in answering questions would prevent her from being a credible witness at trial. (Id. at 205-06.) Sheeheed also knew that putting Foster on the witness stand would open her up to cross-examination about Foster's failure to provide the shoe store alibi until three months after Whiting's arrest, and about their presence at the ATM near the site of the robbery, as well as jacket Whiting was wearing that day. (Id. at 207). Sheeheed's supervisor, Andrew Eibel, who also testified at the evidentiary hearing, explained that he agreed with Sheeheed's instinct that Foster's status as Whiting's ex-girlfriend would raise credibility issues in light of the fact that there was no evidence to corroborate her testimony (aside from the damaging bank photographs). (Id. at 440-41.)

In December 2003, Sheeheed filed a Notice of Alibi in order to preserve the option of calling Foster as a witness in the event Whiting insisted upon it at trial. (Id. at 54.) In March 2004, Sheeheed sent an investigator to the shoe store for the first time. (Id. at 74.) Personnel at the store would not give the investigator any information without permission from the owner,

and Sheeheed chose not to pursue the investigation because she continued to believe that the alibi was not credible. (Id. at 74-75.) Sheeheed did not mention the alibi in her opening statement at trial. At the close of the People's case, Sheeheed withdrew the Notice of Alibi. She and her supervisor discussed with Whiting the problems with calling Foster as a witness, and Whiting ultimately agreed to withdraw the alibi. (Id. at 67.)

A. Counsel's failure to adequately and promptly investigate the shoe store alibi

Whiting argues that Sheeheed was ineffective because she failed to promptly investigate the shoe store alibi. Counsel's duty to investigate "requires counsel 'to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'" Greiner v. Wells, 417 F.3d 305, 320-21 (2d Cir. 2005) (quoting Strickland, 466 U.S. at 691). "It does not, however, compel defense counsel to investigate comprehensively every lead or possible defense." Id. at 321. The reasonableness of an investigation depends on the facts of a case, but "when there is 'reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.'" Id. (quoting Strickland, 466 U.S. at 691).

The state court found that Sheeheed's decision not to immediately investigate Whiting's shoe store alibi "was a reasonable conclusion based on the failure of both the defendant and Foster for several months to tell her he was there, which conclusion was supported by the defendant's 'sleeping through' his polygraph appointment." People v. Whiting, 2008 WL 4916298, at *7. The state court correctly noted that under Strickland, "an attorney is not required to conduct what would be, in the judgment of the attorney, a fruitless investigation." Id. (citing Henry v. Poole, 409 F.3d 48, 63 (2d Cir. 2005)). However, the state court went on to find that "despite her reservations about the shoe store alibi, it would not have taken much effort to

9

send an investigator to the shoe store, which Sheeheed subsequently did prior to the trial[.]" Id. at *8. Thus, the state court found that "Sheeheed may have been arguably deficient in not promptly sending an investigator to the shoe store after belatedly being told of this unlikely alibi." Id. Neverthless, the state court ultimately denied the claim under the prejudice prong of Strickland, holding that Whiting had failed to establish prejudice because he produced "no evidence at the hearing to create a reasonable probability that anyone in the shoe store would have testified at the trial that he was at the store with Foster or that the store contained surveillance cameras that recorded his presence." Id.

In its analysis of Whiting's ineffective assistance claim, the state court credited Sheeheed's testimony at the evidentiary hearing that neither Whiting nor Foster told her about the shoe store alibi in their early meetings. Id. at *2-3. The state court credited this testimony over testimony given by both Whiting and Foster that they promptly told Sheeheed about the shoe store alibi. Id. The Court expressly stated that it did not credit Whiting's testimony "because if [Whiting] had mentioned the shoe store in their early conversations, Sheeheed likely would have told this to Eibel, also likely would have made a note in her file of this information, and also likely would have acted promptly to confirm it as she had done when the defendant told her about being at the bank." Id. at *3. Whiting now challenges this credibility determination as unreasonable in light of the evidence presented at the hearing. "'A determination of a factual issue made by a State court shall be presumed to be correct.'" Shabazz v. Artuz, 336 F.3d 154, 161 (2d Cir. 2003). "This presumption of correctness is particularly important when reviewing the [state] court's assessment of witness credibility." Id. Having reviewed the hearing transcript and record in this case, the Court finds that the state court's credibility findings were not unreasonable in light of the evidence presented at the state court hearing.

Moreover, even if the state court did err in crediting certain testimony, all of the testimony described above was relevant to the question of whether Sheeheed's performance was deficient in light of her failure to more promptly investigate the shoe store alibi. The state court ultimately dismissed this claim on the prejudice prong of <u>Strickland</u>, not the prejudice prong. The state court pointed out that Whiting presented no evidence at the hearing that an earlier investigation by Sheeheed into the shoe store alibi would have uncovered any helpful evidence that could have been admitted at trial. <u>People v. Whiting</u>, 2008 WL 4916298, at *8-9. Although Sheeheed did not promptly send an investigator to the shoe store immediately, when she did send an investigator in March 2004, the investigator was met with unhelpful personnel. Given the lack of information about what a more thorough investigation would have uncovered, the Court finds that the state court's denial of Whiting's claim on prejudice grounds was not contrary to, or an unreasonable application of, federal law. <u>See Schulz v. Marshall</u>, 528 F. Supp. 2d 77 (E.D.N.Y. 2007) (finding no prejudice under <u>Strickland</u> based on alleged failure to conduct an adequate pre-trial investigation because of "the lack of information regarding what such investigation would have uncovered.").

     B. <u>Counsel's failure to call Foster as a witness at trial</u>

Whiting also argues that Sheeheed was ineffective because she failed to call Foster as a witness at trial. "Courts applying <u>Strickland</u> are especially deferential to defense attorneys' decisions concerning which witnesses to put before the jury. 'The decision not to call a particular witness is typically a question of trial strategy that reviewing courts are ill-suited to second-guess.'" <u>Greiner</u>, 417 F.3d at 323 (quoting <u>United States v. Luciano</u>, 158 F.3d 655, 660 (2d Cir. 1988) (per curiam)). Thus, "'counsel's decision as to whether to call specific witnesses – even ones that might offer exculpatory evidence – is ordinarily not viewed as a lapse in

professional representations.'" Id. (quoting United States v. Best, 219 F.3d 192, 201 (2d Cir.

2000)); see Eze v. Senkowski, 321 F.3d 110, 129 (2d Cir. 2003) (noting that courts are "reluctant

to disturb" counsel's decision not to call a particular witness, so long as the decision "was

grounded in some strategy that advances the client's interests."). Moreover, an attorney's

concern that calling a particular witness could "open[] the door" to potentially damaging

testimony is a sound tactical basis for deciding not to call that witness. United States v. Best,

219 F.3d 192, 202 (2d Cir. 2000) (rejecting ineffective assistance claim based on decision not to

call a particular witness).

The state court held that Sheeheed's "decision not to call Foster as an alibi witness should

not be second-guessed with the benefit of hindsight." People v. Whiting, 2008 WL 4916298, at

*10. The state court reasoned:

> Given the above-noted credibility issues surrounding Foster's uncorroborated and
> belated claim that the defendant was with her at the shoe store, and the
> incriminating potential of her testimony placing him at the bank with her near the
> scene of the crime which would also possibly reveal that the defendant was
> wearing a coat matching the one described by Negron, not calling her as a witness
> was an objectively reasonable professional decision made with the concurrence of
> Sheeheed's experienced supervisor and ultimately agreed to by the defendant.

Id. Moreover, the state court found that Whiting failed once again to satisfy the second prong of

Strickland, as he failed to demonstrate that calling Foster as a witness at trial would have resulted

in an acquittal. Id.

Whiting argues that it was unreasonable for the state court to conclude that there were

"credibility issues" surrounding Foster's uncorroborated story of what happened on the day of

the robbery. Whiting also argues that the evidence presented at the hearing failed to support the

state court's conclusion that there was a strategic reason for not calling Foster, and failed to

support Sheeheed's belief that Foster would have been a weak witness. Whiting argues that if

the ATM photographs had been introduced, they merely would have confirmed evidence presented by the prosecution that Whiting lived in the area where the robbery occurred and that he owned a beige coat.

The record indicates that Sheeheed made a strategic decision not to call Foster as a witness because Sheeheed believed it would be harmful to her client's interests, in part because it would open the door to potentially damaging information on cross-examination. The Court finds that Sheeheed's decision was reasonable in light of the information available at the time of trial. Although Whiting argues that the introduction of the ATM photographs would merely have confirmed evidence already introduced by the prosecution at trial, it was not unreasonable for counsel to determine that the jury could interpret the photographs as confirming that Whiting was in the neighborhood and wearing his beige coat at the time the robbery took place. The record supports a finding that Sheeheed's decision not to call Foster was "grounded in some strategy that advances the client's interests," Eze, 321 F.3d at 129, and accordingly the state court's denial of this claim under Strickland was not contrary to, or an unreasonable application of, clearly established federal law.

C. Counsel's subjective motivation for refusing to call Foster as a witness

Whiting argues that Sheeheed's decision not to call Foster as a witness was motivated by two things: (1) Sheeheed's belief that Whiting and Foster were lying; and (2) her personal fear that calling Foster without having aggressively investigated the shoe store alibi would open Sheeheed up to criticism. Whiting argues that refusing to call a witness based on these subjective motivations constituted an ethical violation that deprived him of the effective assistance of counsel. He argues that Sheeheed had a duty to candidly confront him about her disbelief in his alibi, and that Sheeheed breached that duty when she told him that the only

13

reason she was not calling Foster was because Shaheed believed Foster would be a weak witness and subject to impeachment on cross-examination. Whiting contends that if he had known that Sheeheed had not conducted a full investigation into the shoe store alibi and was not going to put Foster on the stand because Sheeheed thought Foster and Whiting were lying, Whiting would have insisted that Foster testify or would have discharged counsel.

The state court addressed this claim in its order denying Whiting's § 440.10 motion. The state court found that although Sheeheed's personal views of Foster's credibility played a role in her determination of whether the jury would believe Foster, this did not mean that Sheeheed chose not call Foster because solely because Sheeheed did not personally believe the alibi. Rather, the state court emphasized that "the evidence showed . . . that Sheeheed utilized her own opinion of Foster's credibility, as well as the risks involved in calling her as a witness, to determine that calling Foster ultimately would not help the defense case." People v. Whiting, 2008 WL 4916298, at *12. The court further found that even if Sheeheed's decision not to call Foster was motivated by personal reasons, such as avoiding criticism about the way the investigation was handled, her "decision and advice to the defendant not to call Foster as a witness was within reasonable professional norms and not shown to have prejudiced the defendant or deprived him of meaningful representation." Id.

Having reviewed the record, this Court finds that Sheeheed's decision to advise her client against calling Foster as an alibi witness, whatever the underlying motivation, fell within the "wide range of reasonable professional assistance." Strickland, 466 U.S. at 689. Whiting has not established that Sheeheed put her own interests above those of her client. Rather, the hearing evidence showed that Sheeheed made strategic decisions about how to present the best possible defense case. In addition, Whiting has not established that there is a reasonable probability that

14

the outcome of his trial would have been different if Foster had testified. <u>U.S. v. Pitcher</u>, 559

F.3d at 559. Accordingly, Whiting is not entitled to habeas relief on this claim.

D. <u>Counsel's inadequate presentation of the misidentification defense</u>

The defense theory presented at trial was one of mistaken identification. Throughout the

reply brief submitted by Whiting in support of his habeas petition, Whiting refers to various

"mistakes" made by Sheeheed in her presentation of this defense. Whiting appears to be arguing

that the aggregation of these mistakes rose to the level of an abandonment by counsel of the

defense's primary theory of the case. The alleged mistakes include counsel's failure to elicit

evidence that the defendant has certain notable physical features that were not included in the

victim's description of the robber, counsel's failure to offer evidence that Whiting never went by

the nickname "Unique" or "Mousey" but instead goes by the nickname "Eddie," and counsel's

failure to introduce the mugshot of the individual known as "Mousey."

Although this claim was beyond the scope of the hearing ordered by the state court on

collateral review, the state court considered the claim on the merits in its order denying

Whiting's motion for relief. <u>People v. Whiting</u>, 2008 WL 4916298, at *10-11. The state court's

determination of this claim is therefore entitled to AEDPA deference. As to the evidence about

Whiting's physical characteristics, the state court found that "the extent of these impairments as

they may have existed at the time of the crime was not shown at the hearing to have been

particularly noticeable" and thus "the defendant did not meet his burden to show that the jury

would have concluded that [the victim] should have noticed them, recalled them, and described

them to the police." <u>Id.</u> at *10. Accordingly, the state court found that Whiting had failed to

satisfy the prejudice prong of <u>Strickland</u> because he had not established that, if these issues had

15

been raised at trial, there was a reasonable probability that they jury would have concluded Whiting was misidentified. Id.

As to the evidence about Whiting's nicknames, the state court found that this claim failed under both prongs of Strickland. Id. at *11. The state court pointed out that Sheeheed did establish at trial that the police did not know the real name of the individual who used the nickname "Unique," and affirmatively linked two people other than Whiting to the other two nicknames provided in the anonymous tip, one of whom was Grajales. Id. The state court found that the introduction of this evidence "at least gave the jury the impression that the defendant was not as well-known to the police as the other two individuals whose nicknames were also known and also allowed for the argument that there was no evidence that the defendant was known by any of these nicknames which were provided by an apparently reliable source." Id. The state court noted that Whiting had failed to suggest how Shaheed could have definitely proven that Whiting never went by any of these nicknames. Ultimately, the state court concluded that Whiting's argument invoked "the type of hindsight that should not be used to evaluate whether a trial strategy was reasonable under prevailing professional norms." Id.

The Court finds that Whiting's claims about his counsel's presentation of the misidentification defense at trial challenge precisely the kind of "trial strategy that reviewing courts are ill-suited to second-guess." Greiner, 417 F.3d at 323. Moreover, Whiting has failed to establish that there "is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." U.S. v. Pitcher, 559 F.3d at 559. Accordingly, the state court's denial of this claim was not contrary to, or an unreasonable application of, Strickland.

16

## II.    Failure to disclose **Brady** Material

Whiting argues that he is entitled to habeas relief because the prosecution failed to

disclose certain information prior to trial, in violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).

"Under <u>Brady</u>, the State violates a defendant's right to due process if it withholds evidence that

is favorable to the defense and material to the defendant's guilt or punishment." <u>Smith v. Cain</u>,

132 S. Ct. 627, 630 (2012); <u>see</u> <u>United States v. Paulino</u>, 445 F.3d 211, 224 (2d Cir. 2006).

Suppressed evidence is "material" under <u>Brady</u> "when there is a reasonable probability that, had

the evidence been disclosed, the result of the proceeding would have been different," or in other

words if the undisclosed evidence "'could reasonably be taken to put the whole case in such a

different light as to undermine the confidence in the verdict.'" <u>Cone v. Bell</u>, 556 U.S. 449, 469-

70 (2009) (quoting <u>Kyles v. Whitley</u>, 514 U.S. 419, 435 (1995)).

Whiting claims that the prosecution violated <u>Brady</u> by failing to disclose (a) the weight,

height and nickname information as the individual known as Mousey; (b) Sergeant's Brill's

memo-book notes containing information about the anonymous tip he received; and (c) police

reports documenting threats that the victim, Negron, allegedly received prior to testifying at

Grajales' trial to induce him to change his testimony.

Whiting raised each of these claims to the Appellate Division on direct appeal.  The

Appellate Division denied the claims, stating that "defendant's contentions in point two of [] his

brief relating to <u>Brady</u> violations . . . are without merit." <u>People v. Whiting</u>, 824 N.Y.S.2d at

905.  Because the state court adjudicated Whiting's <u>Brady</u> claims on the merits, AEDPA

deference applies.

17

A. Failure to disclose height, weight and nickname information of the individual known as "Mousey"

Whiting argues that the prosecution committed a Brady violation when it failed to turn over a "nickname sheet" indicating the height and weight of the individual known as Mousey, who was identified by the anonymous source as one of the robbers. According to Whiting, this information would have enhanced his misidentification defense because Whiting resembles Mousey in height and weight.

The state court's denial of this claim was not contrary to, or an unreasonable application of, clearly established federal law. As an initial matter, Whiting has presented no support for his assertion that the police were in possession of this information and failed to disclose it. Prior to trial, the prosecution produced a mug shot of Mousey and the photographic array that was shown to Negron containing Mousey's picture. Whiting has made no showing that the prosecution had in its possession any further details about Mousey's height and weight, and this alone defeats Whiting's claim for relief. See Mallet v. Miller, 432 F. Supp. 2d 366, 377 (S.D.N.Y. 2006) ("It is well established that mere speculation that exculpatory evidence was withheld is insufficient to warrant habeas relief.") (citing Strickler v. Greene, 526 U.S. 263, 286 (1999)).

Even if the Court assumes that the prosecution had this information and failed to disclose it, Whiting has not demonstrated that the disclosure of this information would have "put the whole case in such a different light as to undermine confidence in the verdict." Cone, 556 U.S. at 470. At best, Whiting could have used this information to argue at trial that Negron mistook him for one of the robbers because of their similar height and weight. Although this argument may have provided support for Whiting's misidentification theory, the jury would still have been free to credit Negron's testimony at trial that he clearly remembered Whiting's face and beige

18

jacket when he saw him on the street as the face and jacket of the man who had robbed him. (Trial Tr. at 44.) Negron testified, without making any reference to Whiting's height or weight, that he "definitely [knew] it was them," when he saw Whiting and Grajales. (Trial Tr. at 45.) In light of this testimony, the Court cannot say that there was a "reasonable probability" that the jury would have acquitted Whiting if he had presented additional facts about Mousey's height and weight in support of his misidentification defense. Accordingly, Whiting is not entitled to relief on this claim.

B. Sergeant Brill's notes

Whiting next claims that the prosecution violated Brady by withholding Sergeant Brill's memo-book notes describing the anonymous tip he received about the identity of the robbers.

"Evidence is not 'suppressed' [for Brady purposes] if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence." United States v. Diaz, 922 F.2d 998, 1007 (2d Cir. 1990) (quoting United States v. LeRoy, 687 F.2d 610, 618 (2d Cir. 1982) (citations omitted)). To the extent that the information provided in the anonymous tip could be characterized as "exculpatory," Whiting has not shown that such information was suppressed. The prosecution disclosed to Whiting that it received an anonymous tip providing the nicknames of three suspects in the robbery. It also disclosed to Whiting that the police knew the identity of the men associated with two of those nicknames (Mousey and Corky), and that the police thus showed photographs of those two men to Negron in photographic arrays. The prosecution disclosed the results of the photo arrays and copies of the photographs used. The prosecution also disclosed that they did not know the real name of the person associated with the third nickname, Unique. Whiting has not established that Sergeant Brill's notes would have contained any additional exculpatory evidence, and the Court finds that

19

Whiting knew "the essential facts permitting him to take advantage" of the exculpatory evidence. Diaz, 922 F.2d at 1007. Accordingly, the state court's denial of his Brady claim was not contrary to, or an unreasonable application of, clearly established federal law.

C. Police reports documenting threats to Negron

Finally, Whiting argues that the prosecution committed a Brady violation by failing to disclose police reports documenting alleged threats made to Negron in order to induce him to change his testimony at Grajales' trial.

At Whiting's trial, defense counsel cross-examined Negron about inconsistencies between his testimony on direct examination and the testimony he previously gave at Grajales' trial. (Trial Tr. at 79-81.) Specifically, it appears from the record that Negron emphasized at Grajales' trial that he recognized the taller of the two men (Grajales) when he saw them on the street a week after the robbery, but was less certain that the shorter one (Whiting) was one of the robbers. (Id. at 80.) On direct examination at Whiting's trial, on the other hand, Negron testified that he called the police as soon as his friend pointed out the shorter of the two men (Whiting). (Id. at 78.)

Immediately following cross examination, the parties conferred with the trial judge outside of the presence of the jury. The prosecutor informed the court and defense counsel that he had just learned that morning that Negron had been threatened prior to Grajales' trial into "back[ing] off about how strong or convinced he was" in his identification of Whiting. (Id. at 93.) The prosecutor sought permission from the trial court to establish on re-direct that these threats were the reason Negron testified at Grajales' trial that he was uncertain in his identification of Whiting. (Id.) The trial court reprimanded the prosecutor for failing to disclose this information to defense counsel before she cross-examined Negron about his inconsistent

20

testimony. (Id. at 94.) The trial court prohibited the prosecutor from raising the alleged threats on re-direct because it seemed that the prosecution essentially had laid a trap to let the defense counsel ask about the inconsistent testimony just so the prosecution could raise the threats on re-direct. (Id. at 95). The judge refused to allow the prosecutor to proceed down those lines, finding that the information should have been brought up before cross-examination. (Id.) Defense counsel pointed out Negron's inconsistent testimony in summation. (Id. at 224.)

The Court finds that Whiting has failed to establish the elements of a Brady violation on this claim. First, Whiting has not established that the prosecution failed to disclose any exculpatory information. To the contrary, if Negron was threatened by someone not to inculpate Whiting, this information would have been more harmful than beneficial to the defense case. Moreover, in light of the trial court's ruling prohibiting the prosecutor from questioning Negron about the threats, Whiting has not established that he was prejudiced by the prosecution's failure to disclose this information earlier. Defense counsel was permitted to impeach Negron with his inconsistent statements and draw attention to those inconsistencies in summation, while the prosecutor was not permitted to rehabilitate Negron by introducing evidence of the threats that allegedly influenced his testimony at Grajales' trial. Accordingly, Whiting is not entitled to habeas relief on this claim.

21

## CONCLUSION

The petition is denied. No certificate of appealability shall issue because there has been no "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c). The Clerk of Court is directed to enter judgment and to close this case.

SO ORDERED.

Dated: Brooklyn, N.Y.
     September 7, 2012

/S/

Carol Bagley Amon
Chief United States District Judge